IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LONNIE K. MURRILL                          :

                                           :

    v.                                     :   Civil Action No. DKC 17-2255

                                           :

OTIS MERRITT, WARDEN, et al.               :

                                           :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights case are:  Defendant Kevin Hickson's ("Mr. Hickson") motion to dismiss (ECF No. 93), Defendant Wexford Health Sources, Inc.'s ("Wexford") motion to dismiss (ECF No. 98), and Plaintiff's motions for entry of default against Defendants Kelcie Hough (ECF No. 105) and Sunday Ogundipe (ECF No. 106).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion to dismiss filed by Defendant Hickson will be denied.  The motion to dismiss filed by Defendant Wexford will be granted.  The motions for entry of default against Defendants Hough and Ogundipe will be granted.

**I.   Background**

Unless otherwise noted, the facts outlined here are set forth in the third amended complaint and construed in the light most favorable to Plaintiff.  In January 2013, Mr. Murrill was placed

into the pre-trial custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS") at the Baltimore City Detention Center ("BCDC")[1].  Shortly thereafter, he was convicted and sentenced.   Following sentencing, he was supposed to be transferred to the Maryland Department of Corrections ("DOC") and housed in protective custody because he required special protection from other inmates.  Mr. Murrill was instead left at BCDC and housed in administrative segregation—a section designated for inmates posing a serious threat to the general population.  On January 27, 2015, an inmate by the name of Joel Santiago viciously assaulted another inmate.  As a result, DPSCS officials placed Mr. Santiago into administrative segregation in a shared cell with Mr. Murrill located on the T block.

Mr. Santiago's placement into Mr. Murrill's cell caused him to fear for his safety as Mr. Santiago was known among the prisoners for his violence and possessed the delusion that Mr. Murrill was sent there to kill him.  Mr. Murrill orally requested a transfer several times to no avail.  On February 15, 2015, Mr. Murrill filed an official grievance with the BCDC Resident Grievance Office ("RGO") requesting an immediate transfer.

In the early morning hours of February 16, 2015, Mr. Santiago brutally attacked Mr. Murrill until he lay incapacitated on the

---

[1] Medical services for incarcerated individuals at BCDC were provided by Wexford.

floor of their shared cell.  During the attack, Mr. Murrill cried out for help but received no assistance from any BCDC guards. While Section T, the area in which Mr. Murrill was housed during the attack, was a two-man post, it was staffed by only one guard at the time of the attack.  The guards are supposed to conduct rounds at regular intervals to observe inmates but failed to do so in the hours after the attack.  As a result, Mr. Murrill was not found and seen by a doctor until 12:09 PM that day.

Mr. Murrill was ultimately sent to the R. Adams Cowley Shock Trauma Center in Baltimore where he was treated for three days. On February 19, 2015, he was moved to an infirmary bed at Metropolitan Transition Center ("MTC").  Staff at MTC were unable to get in contact with Wexford to discuss his condition.  On March 11, 2015, Mr. Murrill was transferred back to BCDC.  He was scheduled to see a neurosurgeon on March 18, 2015 but was not seen until almost a month later on April 16, 2015.  Mr. Murrill was then transferred to the wrong prison and deprived of his prescribed psychiatric and somatic medications.  He continued to be wrongfully transferred between prisons and deprived of his prescriptions for more than three months after the attack.

Mr. Murrill sustained permanent neck and spine injuries from the attack.  No record of the attack was included in the Section T Logbook or the BCDC Serious Incident Reports and Mr. Santiago was never formally reprimanded for the attack.

## II.  Procedural History

On August 7, 2017, Mr. Murrill, proceeding *pro se*, filed a complaint against BCDC and BCDC's Warden, Otis Merritt.  (ECF No. 1).  On September 17, 2017, still proceeding *pro se*, Mr. Murrill filed an amended complaint.  (ECF No. 3).  On March 15, 2018, Warden Merritt and BCDC jointly filed a motion to dismiss the amended complaint.  (ECF No. 18).  On June 26, 2018, Mr. Murrill filed his opposition (ECF No. 23), and a second amended complaint adding additional defendants.  (ECF No. 24).  On January 14, 2019, the court dismissed the claims asserted against BCDC, deferred ruling on the claims against Warden Merritt, appointed counsel for Mr. Murrill, and granted leave to amend the second amended complaint.  (ECF No. 27).  On November 14, 2019, Mr. Murrill, through counsel, filed the presently pending third amended complaint against twenty-three defendants alleging a violation of his Eighth Amendment rights (Count I), a violation of his Fourteenth Amendment Due Process rights (Count II), a violation of the Maryland Code of Correctional Services (Count III), gross negligence (Count IV), and negligence (Count V).  (ECF No. 45).  Most of the defendants answered the third amended complaint.  Two filed motions to dismiss:  on May 26, 2020, Mr. Hickson filed a motion to dismiss (ECF No. 93-1) and on July 9, 2020, Wexford filed a motion to dismiss.  (ECF No. 98).  On July 19, 2020, Mr. Murrill responded to Mr. Hickson's motion.  (ECF No. 101).  On July 30,

2020, Mr. Hickson replied.  (ECF No. 102).  On August 6, 2020, Mr. Murrill responded to Wexford's motion.  (ECF No. 93).  On August 22, 2020, Wexford replied.  (ECF No. 104).  Two defendants have not appeared at all and, on September 3, 2020, Mr. Murrill filed motions for entry of default against Defendant Hough (ECF No. 105) and Defendant Ogundipe (ECF No. 106).

## III. Motion to Dismiss

### A.   Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

"[W]hile a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, [f]actual allegations must be enough to raise a right to

relief above the speculative level." *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012) (internal quotation marks and citation omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).   In evaluating the complaint, unsupported legal allegations need not be accepted.   *See Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).   Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"   *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).   Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

**B.   Analysis**

**1.   Mr. Hickson's Motion to Dismiss**

Mr. Hickson argues that the third amended complaint should be dismissed as to him because its "failure to allege any facts demonstrating [his] personal involvement in the alleged deprivation of [Mr.] Murrill's civil rights is dispositive of Counts 1 [] and 2 [] because personal involvement is an essential element of claims arising under 42 U.S.C. § 1983." (ECF No. 93-1, at 1).   He further argues that he is entitled to qualified immunity for Counts I and II and to statutory immunity for counts III, IV, and V, and that all claims are barred by the three-year statute of limitations.

**a.   42 U.S.C. § 1983 Claims**

**1)   Count I**

Mr. Murrill alleges in Count I that Mr. Hickson violated his Eighth Amendment right by acting with deliberate indifference in both his failure to protect Murrill from the attack and by failing to ensure he received proper and timely care after the attack.

"The [E]ighth [A]mendment protects a convicted inmate from physical harm at the hands of fellow inmates resulting from the deliberate or callous indifference of prison officials to specific known risks of such harm, just as it protects against harm

resulting from deliberate indifference of prison officials to serious medical needs." *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (internal quotation marks and citation omitted).   In order to state a claim for failure to protect, an inmate must plead facts that show that he was incarcerated under conditions posing a substantial risk of serious harm, that the official was deliberately indifferent to that substantial risk to his health and safety, and that the official's deliberate indifference caused him harm.   Deliberate indifference is a subjective standard, meaning that the prison official must have actually known or been aware of the excessive risk to inmate safety.   *See Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).   For example, if a

> plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.*   In *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985), the court found that "personal involvement stemming from [one's] duties as Warden [could be sufficient] to establish a basis for § 1983 liability."

"[L]iability under 42 U.S.C. § 1983 must be premised on personal conduct and cannot rest on respondeat superior." *Monell v. Dept. of Social Services*, 436 U.S. 658, 691–695 (1978). A supervisor may be liable, however, if his alleged supervisory indifference or tacit authorization of subordinate misconduct is a causative factor in a person's constitutional injuries. *See Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) ("supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates").

In the context of a failure to protect claim, however, a plaintiff "assumes a heavy burden of proof . . . [h]e not only must demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'"   *Id*. at 373, citing *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980). A supervisor's "continued inaction in the face of documented widespread abuses," *id.*, might prove such a state of mind. "The proper question is whether [a supervisor] acted wantonly, obdurately, or with deliberate indifference to the

pervasive risk of harm." *Moore v. Winebrenner*, 927 F.2d 1312, 1315 (4th Cir. 1991). If these requirements are not met, a supervisor is not directly liable.

Here, Mr. Hickson argues that Mr. Murrill fails to allege facts sufficient to either show or infer that he acted with deliberate indifference because "[t]he sole allegations specific to Mr. Hickson are [that] 'Defendant Kevin Hickson is an individual over the age of 18, and was a Duty Lieutenant assigned to BCDC Section T during the C shift on February 15, 2015.'" (ECF No. 102, at 2) (citing ECF No. 45, ¶ 26).  Mr. Murrill responds that "there is more than a plausible inference" that Mr. Hickson knew about the risk Mr. Santiago posed to his safety because among other things, he "directly complained to Hickson about Santiago" and "complained to officers that reported directly to Hickson." (ECF No. 101, at 16-17).  In actuality, the amended complaint alleges only that "Mr. Murrill orally requested a transfer several times" (not that he complained directly to Mr. Hickson) and that he "filed an official grievance with the BCDC Resident Grievance Office" the day before the attack (but not that any person he complained to reported directly to Mr. Hickson).[2]  (ECF No. 45, ¶¶ 57-58).

---

[2] A complaint may not be amended simply by mentioning additional facts in response to a motion to dismiss, and the complaint has already been amended several times.  Nevertheless, should Plaintiff seek once more to amend, leave ordinarily is denied "only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving

Even without those specific allegations, however, the remaining allegations contained in the third amended complaint, when taken together and viewed in the light most favorable to Plaintiff, are sufficient to draw a reasonable inference that Mr. Hickson had personal knowledge of the substantial risk of serious harm facing Mr. Murrill.  Such allegations include that Mr. Hickson:  (1) held a supervisory role as Duty Lieutenant at BCDC; (2) was on duty for Section T during the time of the attack; (3) failed properly to staff the block holding Mr. Murrill and to ensure body checks were conducted at regular intervals; (4) failed to add an entry noting the attack to the Section T Logbook; and (5) failed to reprimand Mr. Santiago for the attack.  (ECF No. 45, ¶¶ 26, 61-64).  The third amended complaint further alleges that Defendants:  (1) were aware Mr. Murrill required protective custody; (2) were on notice that Mr. Santiago posed a general danger to other inmates given his previous attack of an inmate; (3) were on notice about the danger Mr. Santiago posed specifically to Mr. Murrill because he repeatedly requested transfer in the three weeks preceding the attack and because he filed a formal grievance the day before the attack; (4) failed to comply with

---

party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986); *see also Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.2d 369, 379 (4th Cir. 2012).  An amendment is futile if it could not withstand a motion to dismiss.  *See Perkins v. U.S.*, 55 F.3d 910, 917 (4th Cir. 1995).

DPSCS and BCDC policies; (5) failed to take available reasonable measures to protect Mr. Murrill; and (6) failed to stop the attack while it occurred despite Mr. Murrill's cries for help. (ECF No. 45, ¶¶ 48-54, 58, 61-64, 108-113). Here, as in *Wright*, "[i]t is conceivable that, if [Murrill] is permitted to press his claim on the merits, he may be able to show sufficient personal involvement stemming either from [Hickson's] duties as [Duty Lieutenant] or from his receipt of notification" from various possible sources that Mr. Santiago posed a substantial threat to inmate safety.

Similarly, Mr. Murrill has sufficiently alleged that Mr. Hickson acted with deliberate indifference to his plainly obvious serious medical needs following the attack. To state a claim for denial of medical care, an inmate must plead facts that show "that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need." *Barnes v. Wilson*, 110 F. Supp. 3d 624, 631 (D.Md. 2015) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available." *Id.*

It is undisputed that Mr. Murrill was suffering from an objectively serious medical need. (*See generally* ECF Nos. 45; 93-

12

1).  With respect to the subjective knowledge prong, Mr. Murrill alleges that Mr. Hickson failed to monitor his safety when locked in a cell with a cellmate known to be dangerous and failed to respond in any capacity to his repeated cries for help during the attack.  These failures resulted in a nearly eight-hour delay in learning of Mr. Murrill's serious injuries and getting him medical attention.  As stated above, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.  Mr. Murrill's allegations support a reasonable inference that Mr. Hickson was deliberately indifferent to his serious medical needs following the attack.

Finally, contrary to Mr. Hickson's assertion, Mr. Murrill makes clear that he does not seek to hold him liable in his supervisory capacity under a theory of respondent superior, but rather for his personal involvement in failing to protect him from a substantial risk of harm or for his allegedly tacit approval of misconduct by subordinate prison officials.

Mr. Hickson also argues that he is entitled to qualified immunity because, even if Mr. Murrill has stated a claim, it cannot be said that that his actions violated a "clearly established" right.  (ECF No. 102, at 16).  Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citations omitted).  To establish a qualified-immunity defense, a public official must show that (1) a plaintiff has not alleged or shown facts that "make out a violation of a constitutional right," or that (2) "the right at issue was [not] clearly established at the time of" its alleged violation.  *Id*. at 232.

> A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but, as the Second Circuit has noted, when asserted at this early stage in the proceedings, the defense faces a formidable hurdle and is usually not successful.  This is so because dismissal under Rule 12(b)(6) is appropriate only if a plaintiff fails to state a claim that is *plausible* on its face.

*Owens v. Balt. City State's Att'ys Office*, 767 F.3d 379, 395–96 (4th Cir. 2014) (internal quotation marks and citations omitted). As discussed, Mr. Murrill has "provide[d] sufficient detail about his claim to show that he has a more-than-conceivable chance of success on the merits." *Twombly,* 550 U.S. at 570.  Accordingly, dismissal on qualified immunity grounds is inappropriate.

### 2)   Count II

Mr. Murrill alleges in Count II that Mr. Hickson violated his Fourteenth Amendment Due Process rights due to a failure "to timely and fully process his grievances before and after the attack." (ECF No. 45, ¶ 123).  The majority of the allegations contained in Count II involve Defendants' failure timely to process grievances

14

submitted by Mr. Murrill *after* the attack.   One allegation, however, is that Defendants failed timely to process a formal grievance that Mr. Murrill filed the day *before* the attack.   (ECF No. 45, ¶¶ 7-8) ("On February 15, 2015, Mr. Murrill filed an official grievance complaining about his housing situation and requesting to be put in a different cell because of his prescient concern for his life and safety from Santiago.   Defendants failed to act.").

Mr. Hickson argues that Count II fails to state a claim because it "alleges no facts linking Mr. Hickson to the receipt or processing of Mr. Murrill's grievances."   (ECF No. 93-1, at 16). Mr. Murrill replies that "the day before his brutal attack, [he] filed an official grievance with the BCDC RGO" and that "[c]learly, there is more than a plausible inference that the Duty Lieutenant would have been aware of this threat."   (ECF No. 101, at 17).

This conclusion is unsupported.   Mr. Murrill alleges no facts allowing for the inference that by virtue of his role as Duty Lieutenant, Mr. Hickson would have had any involvement in the RGO's processing of his pre-attack grievance.   Mr. Murrill has also not alleged that any RGO employee would have formally or informally communicated information it received in a grievance to Mr. Hickson. Thus, even when viewed in the light most favorable to Plaintiff, the complaint fails sufficiently to allege that Mr. Hickson was

personally involved in the untimely handling of the February 15, 2015 grievance.

Likewise, Mr. Murrill has also failed to allege Mr. Hickson's personal involvement in any failures timely to process his post-attack grievances.  Mr. Murrill's allegations include that: (1) for the month that he was held at the Maryland DOC infirmary while recovering from the attack, the officers there gave him misleading information on how to submit grievances resulting in his grievances being sent to the wrong places; (2) MTC failed to conduct a timely review of his complaint resulting in the BCDC RGO's dismissal of his complaint as untimely; (3)the IGO delayed informing him that it lacked jurisdiction over the BCDC; (4) BCDC's grievance procedure was not available to him while housed outside BCDC (due to his infirmary stay and subsequent erroneous transfers); and (5) BCDC's grievance procedure was permanently foreclosed by the facility's closure in July 2015. (*See* ECF No. 45, ¶¶ 77-103).

Most of these allegations pertain only to actions taken by Maryland DOC, MTC, or DPSCS IGO officials.  Mr. Murrill never alleges, however, that Mr. Hickson had any communication or involvement with these officials.  The only allegations that could be construed as possibly relating to Mr. Hickson are those involving the BCDC RGO's rejection of Mr. Murrill's complaint as "untimely." Yet such allegations neither state nor imply that Mr. Hickson had any involvement in the BCDC RGO's decision to reject

16

his complaint.  In sum, Mr. Murrill has not plead facts stating that Mr. Hickson played any role in the untimely processing of either his pre-attack or post-attack grievances.

**b.  State Claims**

As to Counts III, IV, and V, Mr. Hickson argues he is entitled to statutory immunity because Mr. Murrill has not sufficiently alleged that he acted with malice or gross negligence.  (ECF No. 102, at 7).

"[G]enerally[,] under common law, the State [and its employees] enjoy[] sovereign immunity and [are] thus protected from suit for both ordinary torts and State constitutional torts. The State, however, has partially waived this immunity by statute." *Ford v. Baltimore*, 149 Md.App. 107, 120 (2002).  The Maryland Torts Claim Act ("MTCA") waives immunity for tort liability "[if] the State employee has acted with malice or gross negligence." *Id.; see also* Md. Code, Cts. & Jud. Proc. § 5-522(b) (2006).  In such instances, "the injured party may [] bring a viable tort claim against the State employee." *Id.*

> Whether or not gross negligence exists
> necessarily depends on the facts and
> circumstances in each case[,] and is usually
> a question for the jury and is a question of
> law only when reasonable [people] could not
> differ as to the rational conclusion to be
> reached.  Ordinarily, unless the facts are so
> clear as to permit a conclusion as a matter of
> law, it is for the trier of fact to determine
> whether a defendant's negligent conduct
> amounts to gross negligence.

17

*Cooper v. Rodriguez*, 443 Md. 680, 708–09 (2015) (internal quotation marks and citation omitted). Based on the totality of the allegations contained in Mr. Murrill's third amended complaint, a reasonable trier of fact could find that Mr. Hickson acted with gross negligence. Therefore, the issue cannot be resolved as a matter of law and dismissal on statutory immunity grounds is inappropriate.

### c.   Statute of Limitations

Mr. Hickson argues that all claims against him are time barred because the third-amended complaint was filed outside of the statute of limitations period and does not relate back to the original complaint under Fed.R.Civ.P. 15(c). (ECF No. 93-1, at 19-22). Mr. Murrill, on the other hand, contends that his claims against Mr. Hickson sufficiently relate back to the original complaint because both complaints allege a single, continuous fact pattern. (ECF No. 101, at 13-16).

The statute of limitations is an affirmative defense that a party typically must raise in a pleading under Rule 8(c) and is not usually an appropriate ground for dismissal. *See Eniola v. Leasecomm Corp.*, 214 F.Supp.2d 520, 525 (D.Md. 2002); *Gray v. Metts*, 203 F.Supp.2d 426, 428 (D.Md. 2002). Dismissal is proper, however, "when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City*

*of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996); *see* 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357, at 714 (3d ed. 2004) ("A complaint showing that the governing statute of limitations has run on the Plaintiff's claim for relief is the most common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to dismiss under Rule 12(b)(6).").

It is not clear from the face of the complaint that the third amended complaint does not relate back to the date of the original filing. *See* Fed.R.Civ.P. 15(c). It is not obvious that Defendant Hickson "should [not] have expected, within the limitations period, that [he] was meant to be named a party in the first place." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 471 (4th Cir. 2007). Thus, the defense is not appropriately considered at this time and will not bar the addition of Mr. Hickson as a defendant.

## 2.  Wexford's Motion to Dismiss

Wexford argues that it should be dismissed as a defendant because the third amended complaint fails to state a claim against it under 42 U.S.C. § 1983 or under state law for gross or simple negligence. Wexford further argues that all claims are time-barred.

### a.  42 U.S.C. § 1983 Claim

Mr. Murrill alleges in Count IV that Wexford violated his Eighth Amendment right by acting with deliberate indifference to

his serious medical needs.  A prisoner has a constitutional right to the medical care necessary to address his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  A prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care. *See Estelle*, 429 U.S. at 104-05. Importantly, a judicial assessment of deliberate indifference has two aspects — an objective inquiry and a subjective inquiry. *See Jackson*, 775 F.3d at 178.

To satisfy the objective inquiry of a deliberate indifference claim, "the inmate's medical condition must be serious — one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.*  To satisfy the subjective inquiry of a deliberate indifference claim, the plaintiff must show that the official "knows of and disregards an excessive risk to inmate safety or health." *See Farmer*, 511 U.S. at 837.  "Where a deliberate indifference claim is predicated on a delay in medical care . . . there is no Eighth Amendment violation

unless 'the delay *results* in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F.App'x 745, 755 (4th Cir. 2018) (citing *Webb v. Hamidullah*, 281 F. App'x 159, 166-67 (4th Cir. 2008)).

A corporation cannot be held liable under § 1983 unless the entity's policies or customs caused one or more of its employees to deprive the plaintiff of a federally protected right. *See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690-92 (1978); *see also Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *See Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). An official policy may be created "by making a single decision regarding a course of action in response to particular circumstances." *Semple v. City of Moundsville*, 295 F.3d 708, 712 (4th Cir. 1999) (citing *Pembaur v. Cincinnati*, 475 U.S. 468, 481 (1986)).

Wexford argues that Mr. Murrill's § 1983 claim should be dismissed because his third amended complaint (1) fails to allege facts showing or permitting the inference that any person was deliberately indifferent to a serious medical need and (2) fails

21

to allege facts showing or permitting the inference that Wexford had a policy or custom that led to any person being deliberately indifferent to his serious medical needs.  (ECF No. 98, at 7-8). Mr. Murrill responds that "unreasonable delay in medical treatment on its own may amount to" deliberate indifference and that "taken together, [his assertions] are surely sufficient to allege deliberate indifference." (ECF No. 103, at 15).  To support this, he points to the following facts: (1) he was scheduled to see a neurosurgeon on March 18, 2015 but was "inexplicably not seen until almost a full month later" (ECF No. 45, at ¶ 74); (2) Wexford "ignored attempts by medical staff at MTC to obtain a status report on [his] condition and as a result all attempts at contact between the medical teams failed"[3] (ECF No. 103, at 15); and (3) several improper transfers "regularly deprived [him]" of his prescribed psychiatric and somatic medications, in some instances, for "more than three months."  (*Id.*, ¶¶ 75-76).

Mr. Murrill is correct that "a delay of medical care can be deliberate indifference when it results in some substantial harm to the Plaintiff, such as exacerbation of the injury or unnecessarily prolonging the inmate's pain." (ECF No. 103, at 15); *see Aylor*, 739 Fed.Appx. 745, 755. Here, however, Mr. Murrill

---

[3] The text of the third amended complaint actually states only that "MTC medical staff were unable to reach BCDC medical to give a report on Mr. Murrill's condition, so all attempts at contact between the medical teams failed." (ECF No. 45, ¶ 72).

has failed to allege with any specificity how the postponed neurology appointment or delay in receiving his prescriptions resulted in a substantial harm to him.  For example, he does not state that either delay prolonged his pain.  He states that he continues to suffer from physical and emotional ailments resulting from the attack but never alleges that such ongoing ailments are causally related to the delay of his neurology appointment or in receiving his prescriptions.  He also does not allege anywhere in the complaint that the failed communications between MTC and Wexford caused him any harm.

Even if Mr. Murrill *had* alleged that any person employed by Wexford acted with deliberate indifference, he has not pled facts that allow for the inference that Wexford had a custom or policy that caused any such person to deprive him of a federally protected right.  He has pointed to no written ordinance or regulation by Wexford, and no affirmative decision or omission by a Wexford policymaking official.  Mr. Murrill attempts to argue he has sufficiently alleged the existence of a policy or custom by analogizing to *Owens v. Balt. City State's Att'ys Office*, 767 F.3d 379, 402 (4th Cir. 2014).  There, the plaintiff's complaint survived a motion to dismiss because it alleged that a series of reported and unreported cases established that the defendant had a custom or policy of unconstitutional practices.  Mr. Murrill points to two cases where it was alleged that Wexford had an unconstitutional

23

policy or practice of denying medical care to inmates and baldly states that, "the case law in this District is replete with examples of Wexford's unconstitutional policies and/or customs." (ECF No. 103, at 17).  Plaintiff's analogy to *Owens* is fruitless because such allegations appear nowhere in his third amended complaint and surface for the first time only in his response. Mr. Murrill has failed to state a § 1983 claim against Wexford.

**b.   State Claims**

Wexford next argues that Mr. Murrill fails to state any negligence claim against it under Maryland law because he fails to allege the applicable standard of care owed by any Wexford employee, how that standard of care was breached, or that Mr. Murrill suffered any injury proximately caused by any breach.  (ECF No. 104, at 7).   Wexford further argues that Mr. Murrill's negligence claims are subject to the requirements of the Maryland Health Care Malpractice Claims Act ("HCMCA") and thus, his failure to arbitrate requires dismissal.  (*Id.*, at 7.)  Mr. Murrill, on the other hand, argues that Wexford "overstates the scope of the HCMCA" and instead contends that the HCMCA does not apply to his claims against Wexford because it does not apply to ordinary negligence claims.  (ECF No. 103, at 19).

The HCMCA provides: "A person having a claim against a health care provider for damage due to a medical injury shall file the claim with the Director [of the Health Care Alternative Dispute

Resolution Office ("HCAO") - a unit of the executive branch of Maryland's state government]" for arbitration.  Md. Code, Cts. & Jud. Proc. § 3-2A-04 (a)(1).  "In general, the [HCMCA] requires certain medical malpractice claims to be submitted to an arbitration panel for initial ascertainment of liability and damages before resort may be had to a court of law for final determination." *Oxtoby v. McGowan*, 294 Md. 83, 86 (1982).  "[T]he legislative mandate that the arbitration procedure under the Act be followed as a precondition to invoking the general jurisdiction of a court is analogous to the doctrine of exhaustion of administrative remedies." *Id.*, at 91.  Section 3-2A-01(g) of the HCMCA defines "medical injury" as an "injury arising or resulting from the rendering or failure to render health care."

The scope of the HCMCA, while initially murky, has long since been clarified.  *See Brown v. Rabbitt*, 300 Md. 171, 172 (1984) ("For the third time in little over a year we are called upon to determine whether a claim against a health care provider is covered by the Health Care Malpractice Claims Act.").  In determining whether a claim is subject to the HCMCA, "the critical question is whether the claim is based on the rendering or failure to render health care and not on the label placed on the claim.  If health care is or should be rendered and damage results therefrom, then it is a claim under the Act and must first be arbitrated." *Id.*, at 175.  "[O]ur cases make clear that the cause of the injury must

have been 'a breach by the defendant, in [its] professional capacity, of [the] duty to exercise . . . professional expertise or skill' in rendering or failing to render health care." *Afamefune ex rel. Afamefune v. Suburban Hosp.*, Inc., 385 Md. 677, 695 (2005) (internal citations omitted).

> When it is clear from the allegations of the complaint that the plaintiff's claimed injury was not inflicted during the rendering or failure to render medical service or that it was the result of conduct having utterly no medical validity in relation to the medical care rendered, the action properly proceeds in Circuit Court, without first resorting to arbitration.

*Id.* Claims falling outside the scope of the HCMCA include only "those claims for damages arising from a professional's failure to exercise due care in non-professional situations such as premises liability, slander, assault, etc." *Cannon v. McKen*, 296 Md. 27, 37-38 (1983).

The types of cases in which the HCMCA was not applicable include cases where the plaintiff: (1) was sexually assaulted during a medical procedure (*see Afamefune*, 385 Md. 677, 694) ("an assault, rape or attempted rape can in no way be described as medical service"); (2) was held down and struck in the face during a medical procedure (*see Nichols v. Wilson*, 296 Md. 154 (1983); and (3) was pricked by an uncapped hypodermic needle left lying on a surface in a surgical waiting area while accompanying her father to surgery (*see Swam v. Upper Chesapeake Med. Ctr., Inc.*, 397 Md.

26

528 (2007)). Even in *Cannon*, 296 Md. 27, 37–38, where the plaintiff sued her dentist for injuries she sustained when part of a dental chair broke loose and fell on her, the court of appeals remanded the case to the trial court on the ground that the pleadings were "too sparse to allow a determination of whether [the plaintiff's] injury arose because of the defendant's breach of his professional duty owed her or because of a breach of duty which he may have owed her as a premises owner or in some other non-professional capacity." In short, "if the trial court is unable to conclude that the allegations remove the claim from the Act's coverage, the court should not exercise jurisdiction over the claim until a malpractice claim is filed with the HCAO. The HCAO initially will determine if the claim alleges a "medical injury" and is therefore subject to the Act. *Goicochea v. Langworthy*, 345 Md. 719, 728–29 (1997).

Here, Mr. Murrill's negligence claims stem from Wexford's alleged failure to provide prescription medications, timely to see him, and to communicate with other medical providers. Such acts all constitute a "professional duty to exercise the appropriate care required of a health care provider in a professional capacity." *Cannon*, 296 Md. 27, 37 (1983). Contrary to Mr. Murrill's assertions, the fact that he "has not brought a claim for medical malpractice against Wexford" is not dispositive. (ECF No. 103, at 20). Thus, Mr. Murrill's negligence claims fall within

the ambit of the HCMCA and require submission to an arbitration proceeding as a condition precedent to raising the claim in this forum.  Accordingly, these claims will be dismissed.

## IV. Plaintiff's Motions for Entry of Default

### A.    Standard of Review

Pursuant to Fed.R.Civ.P. 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  A defendant's default does not automatically entitle the plaintiff to entry of a default judgment; rather, that decision is left to the discretion of the court. *See Dow v. Jones*, 232 F.Supp.2d 491, 494 (D.Md. 2002).  The United States Court of Appeals for the Fourth Circuit has a "strong policy" that "cases be decided on their merits," *id*. (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993)), but default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party, *see SEC v. Lawbaugh*, 359 F.Supp.2d 418, 421 (D.Md. 2005) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).

### B.    Analysis

#### 1.    Defendant Ogundipe

Defendant Sunday Ogundipe was served properly on March 13, 2020. (ECF No. 82).  Ms. Ogundipe's Answer was due on April 3,

2020.   Due to the COVID-19 state of emergency, Standing Order 2020-07 provided that all filing deadlines originally set to expire between March 16, 2020, and June 5, 2020 were to be extended by eighty-four days, unless "the presiding judge in an individual case set a different date by an order issued after the date of this Order." (ECF No. 86).   Thus, Ms. Ogundipe's deadline for answering was extended to June 26, 2020.   To date, no appearance or answer on behalf of Ms. Ogundipe has been filed.   Accordingly, Mr. Murrill's motion for entry of default as to Ms. Ogundipe will be granted.

### 2.   Defendant Hough

After finding that Mr. Murrill engaged in eight good faith but unsuccessful attempts to effect personal service on Ms. Kelcie Hough, the court granted Mr. Murrill's motion for Alterative Service on Ms. Hough. (ECF No. 76).   Mr. Murrill then mailed the summons and complaint to Ms. Hough's address on April 22, 2020. (*See* ECF No. 86, Exhibit A).   Pursuant to Fed.R.Civ.P. 6(d), Ms. Hough's answer was due on May 16, 2020.   Standing Order 2020-07 had the effect of extending this deadline to August 8, 2020.   To date, no appearance or answer on behalf of Ms. Hough has been filed.   Accordingly, Mr. Murrill's motion for entry of default as to Ms. Hough will be granted.

**V.    Conclusion**

For the foregoing reasons, the motions for entry of default filed by Plaintiff will be granted, the motion to dismiss filed by Defendant Hickson will be denied and the motion to dismiss filed by Defendant Wexford will be granted.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

30