IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LONNIE K. MURRILL           :

                            :

v.                          :   Civil Action No. DKC 17-2255

                            :

OTIS MERRITT, WARDEN, et al. :

                            :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this prisoner civil rights case are two motions for summary judgment, one filed by Defendants Maryland Department of Public Safety and Correctional Services ("DPSCS"), Shawn Bailey, Clyde Bamby, Israel Bolarinwa, Irvin Clark, Terry Edwards, Viola Hall, Kelvin Harris, Betty Johnson, Lancelot Lemonius, Otis Merritt, Daniel Ogunmodede, Cherie Peay, T. Price, Priscilla Reaves, Robin Woolford, Vera Wright, Sonia Young, and J. Michael Zeigler (collectively "State Defendants"), (ECF No. 148), and one filed by Defendant Kevin Hickson, (ECF No. 149).[1]  In addition, State Defendants and Plaintiff filed separate unopposed motions to seal.  (ECF Nos. 150; 161).  The issues have been briefed, and the court now rules, no hearing being necessary.  Local Rule 105.6.  For the following

---

[1] Defendants' memorandum in support of their motion for summary judgment includes the former warden, Otis Merritt, as a movant, although the motion itself does not.  (*See* ECF No. 148-1, at 22).  This appears to be an inadvertent omission and the motion will be treated as being brought by him as well.

reasons, State Defendants' motion for summary judgment will be granted in part and denied in part, Mr. Hickson's motion for summary judgment will be granted in part and denied in part, State Defendants' motion to seal will be granted, and Plaintiff's motion to seal will be granted in part and denied in part.

## I.   Factual Background

On February 16, 2015, Plaintiff Lonnie K. Murrill was attacked in his cell by his cell mate, Joel Santiago.  Mr. Murrill maintains that he should never have been housed with Mr. Santiago because Defendants knew that Mr. Santiago posed a substantial risk of serious harm to him.  He also maintains that, after the attack, Defendants did not provide him with prompt medical care and actively hindered his care in the following weeks.

### A. Mr. Murrill's Placement in Administrative Segregation

Mr. Murrill, who was 44 years old in early 2015, has "a long history of mental and physical vulnerabilities." (ECF No. 159, at 10).  He has been diagnosed with post-traumatic stress disorder ("PTSD"), schizophrenia, and substance abuse disorder.  (ECF No. 148-3, at 14-15, 27-28).[2]  He has seizures, neuralgia and prior fractures.  (ECF No. 148-7, at 2 (Sealed)).  He first entered the

---

[2] As discussed below, State Defendants' Exhibit A, which is Mr. Murrill's deposition, will be sealed and State Defendants will be ordered to file a new redacted version.  The court anticipates that all page numbers cited in the currently filed version, (ECF No. 148-3), will still be accurate for the redacted version.

Baltimore City Detention Center ("BCDC") in 2013 after he was arrested and charged with second degree murder and carrying a dangerous weapon with the intent to injure. (ECF Nos. 159-2, at 2; 148-4). BCDC, which closed in the fall of 2015, was primarily used to house pre-trial detainees. Mr. Murrill was convicted and sentenced on February 5, 2015, to thirty (30) years imprisonment for stabbing and killing Michael Price. (ECF Nos. 148-4; 148-5).

Before his sentencing, Mr. Murrill was placed in Administrative Segregation, Section T, after an altercation with other inmates on January 22, 2015. (ECF Nos. 159-2, at 2; 159-9, at 17).[3] Mr. Murrill attests that he "was attacked, and some other prisoners protected [him]." (ECF No. 159-54, ¶2). The reports of the event, all signed by Defendant Ogunmodede as shift commander, all recount that Mr. Murrill was involved in a physical altercation and was restrained without incident by prison officials who then were assaulted physically by two other inmates, at least one of whom had been involved in the altercation with Mr. Murrill. (*See generally* ECF No. 160-3 (Sealed)). Mr. Murrill reported at the time that he was "st[o]mped on the head and [his right] thigh."

_____

[3] State Defendants assert that Mr. Murrill ultimately shared cell 80 with Mr. Santiago. The cell transfer record Mr. Murrill cites to does not make clear whether the dates it references are when an inmate was transferred into a cell or out of a cell. If the latter, he is correct to refer to cell 80. If the former, then he would have occupied cell 52.

(ECF No. 160-5, at 2 (Sealed)).[4]  He told staff he feared for his safety; members of the Bloods gang were out to get him because the man he murdered was affiliated with the Bloods.  (ECF No. 148-3, at 86-88).  Mr. Murrill does not identify who made the decision to move him to Section T.

DPSCS policy states that "detainee[s] shall be placed on Administrative Segregation to separate them from the general population when it [is] determined that the continued presence of the detainee in general population will pose a serious threat to: life, property, self, staff or other detainees, security or order of the facility."  (ECF No. 159-11, at 24).  "Only the Commissioner, Warden /Director of Population Management /designee are authorized to order the immediate placement of detainees in Administrative Segregation."  (*Id.*, at 23).

Other types of custody are available under DPSCS policy.  One is Protective Custody, which DPSCS policy defines as "non-punitive separation from the general population and from other detainees for reasons of health or safety."  (ECF No. 159-11, at 7). Detainees in protective custody are housed in single cells.  (ECF

---

[4] Mr. Murrill may also have been stabbed during this incident. State Defendants, relying on Mr. Murrill's testimony, say he was. (ECF No. 148-1, at 10).  Mr. Murrill says he became confused during his deposition and was not in fact stabbed.  (ECF No. 159, at 11 n.4).

No. 159-13, at 17).  A detainee may be placed in Protective Custody

for various reasons including:

- A  clear  and  present  danger  of  harm
  exists[;]
- When a detainee cannot be safely housed
  in general population[;]

  . . .

- When a detainee feels that his/her life
  is in danger[;]
- The  detainee  has  a  physical  or
  psychological  condition  which  makes
  him/her  vulnerable  within  the  general
  detainee population;
- The detainee has been the victim of an
  assault and can provide rationale that
  another assault is likely to occur;
- The  detainee  can  identify  specific
  enemies  and  provide  rationale  that  an
  assault by these identified enemies is
  likely to occur[.]

(ECF No. 159-11, at 27; *see also* ECF No. 159-13, at 15, 23-26).

As with Administrative Segregation, only "the Commissioner, Warden

/Director  of  Population  Management  /designee"  can  authorize

placement in a Protective Custody Unit.  (ECF No. 159-11, at 26).

     However, BCDC did not offer protective custody in early 2015.

(ECF No. 159-10, at 11).  DPSCS's corporate designee testifies

that it was "impossible" fully to separate detainees in need of

protective custody because of the way the facility was laid out.

(*Id.,* at 11-12).  As a result, "inmates who would normally be

designated  protective  custody  at  other  institutions  [were]

designated administrative segregation at BCDC."  (*Id.,* at 12).

5

For that and other reasons, it is unclear whether Mr. Murrill was placed in Section T for administrative segregation or protective custody.

In the opinion of Cameron Lindsay, Plaintiff's corrections expert, "Mr. Murrill should have been designated for protective custody at or shortly after he was sentenced." (ECF No. 159-12, at 8). Mr. Murrill's mental and physical ailments "could make [him] more vulnerable to abuse if housed in the general population." (*Id.*). In Mr. Lindsay's opinion, Mr. Murrill therefore "should have been housed in a single cell" under the DPSCS Protective Custody policy. (*Id.*). Moreover, "Mr. Murrill was subsequently designated as an inmate requiring special protection" at other facilities. (*Id.*; *see also* ECF Nos. 159-15; 159-16; 159-17).

**B. Mr. Santiago's Placement in Mr. Murrill's Cell**

Shortly after Mr. Murrill arrived in Section T, Joel Santiago was moved into his cell.[5] On January 27, Mr. Santiago repeatedly

---

[5] State Defendants assert that Mr. Murrill and Mr. Santiago shared joint cells 79/80. (ECF No. 148-1, at 10 & n.3). The cell transfer records to which State Defendants and Mr. Murrill cite for this proposition are not clear. (*See generally* ECF No. 159-2). They include columns that do not indicate whether they reference the date when an inmate was transferred into or out of a cell. (*Id.*). Mr. Murrill's record ties a transfer related to cell 52 to January 23 and a transfer related to cell 80 to February 16. (*Id.*, at 2). Mr. Santiago's connects a transfer related to cell 82 to January 27 and a transfer related to cell 79 to February 25. (*Id.*, at 3). Given that all agree that Mr. Murrill and Mr.

punched another detainee in the face and placed him in a choke hold. (ECF No. 159-20, at 2 (Sealed)). The report on these events was approved by Defendant Ogunmodede as shift commander. (*Id.*). Mr. Murrill and Mr. Santiago were both considered medium security inmates at the time. (ECF Nos. 160-7, at 5 (Sealed); 159-23, at 3).

Warden Johnson and Assistant Warden Peay testify that BCDC had a policy and practice of separating sentenced inmates from pre-trial detainees. (ECF Nos. 159-21, at 7, 11-12; 159-24, at 16-17). Ms. Peay states that a housing decision placing a pretrial detainee with an inmate who had already been sentenced was "not something that should be done . . . [and] would not be approved." (ECF No. 159-21, at 13). According to Plaintiff's correction's expert, "[i]t is inappropriate under any circumstance to house pre-trial and sentenced inmates together." (ECF No. 159-55, at 4). As noted above, Mr. Murrill became a sentenced inmate several days after first being housed with Mr. Santiago, who remained a pre-trial detainee.

In addition, in the opinion of Mr. Murrill's corrections expert:

> Mr. Santiago was a much younger inmate with a serious history of recent and repetitive institutional violence. Based on my 32 years'

_____

Santiago shared a cell in Section T from late January through the date of the attack, it is not necessary precisely to identify the cell they shared.

7

> experience, younger inmates—particularly
> those with a history of criminality and
> institutional violence, like Mr. Santiago—
> tend to be more violent than older inmates.
> Attacks by younger inmates against older
> inmates also tend to be more severe, as the
> older inmates are less able to fight back and
> more likely to suffer long-term injuries.

(ECF No. 159-12, at 9).

Mr. Murrill does not identify which corrections official made the decision to place Mr. Santiago with him, although it appears that Defendant Ogunmodede approved the recommendation for placement in administrative segregation. (ECF No. 148-14, at 156-57). According to Defendants Johnson, Peay, and Young, one of three groups was responsible for housing assignments—the traffic office, the case management team, or the population management unit. (ECF Nos. 148-18, at 107; 148-41, at 111, 132-34; 148-42, at 153). Mr. Murrill does not suggest that any defendants were members of those teams or were required to approve their decisions.

### C. Mr. Murrill's Warnings About Mr. Santiago

Mr. Murrill maintains that he quickly became fearful for his safety once Mr. Santiago arrived. His new cellmate told him he'd assaulted members of a gang and made signs that led Mr. Murrill to believe he was in the Bloods gang, the same one whose members he believed attacked him in January. (ECF No. 148-3, at 97-99). He also testifies that he "had a good relationship" with Mr. Santiago up until the night before the attack. (*Id.*, at 101). But, "[i]t

was kind of weird.  It went okay, but it was kind of -- he wasn't trustworthy.  I knew, I knew my life was in danger.  I knew something was wrong." (*Id.*, at 102).  The whole time Mr. Santiago was with Mr. Murrill, he told him "[i]f you bring meat in this cell one more time, we're gonna have problems." (*Id.*, at 103).  And, "almost every day," Mr. Santiago "said sick stuff" that Mr. Murrill considered threatening.  (*Id.*, at 109).  For example, on one occasion, Mr. Santiago looked at Mr. Murrill "in a certain way" and began talking about the Taliban and "he talked about death to them all, and we'll destroy them first."  To Mr. Murrill, "[i]t was just, it was very weird" and he didn't know if Mr. Santiago "was trying to scare [him.]" (*Id.*, at 108-09).

Mr. Murrill testifies that the day Mr. Santiago arrived, he grabbed the corrections officer ("CO") who delivered Mr. Santiago by the arm and said, "are you sure this guy cannot be in a cell with me.  This guy is dangerous.  He cannot be in a cell with me.  It's impossible.  Something's wrong." (ECF No. 148-3, at 110, 112).  He immediately asked for Administrative Remedy Procedure ("ARP") forms and grievance forms.  (*Id.*).  Mr. Murrill states that he "got the grievance [and] wrote on there that this guy may be a gang member.  My life is in danger, get me out of here."

(*Id.*).[6]  He wrote grievances every day which stated that he "feared for his life" and that if he didn't get help, "either I'm going to get killed, or I'm going to kill him."  (*Id.*, at 111-13, 118-19, 120).  He wrote at least one letter to the Warden.  (*Id.*, at 120).  "[E]very day I requested -- whoever was in charge to come and see me."  (*Id.*, at 112, 115-16).  However, the officers simply made fun of him, "called [him] a skid, B-I-T-C-H, this, that, or whatever it was, but they just didn't care."  (*Id.*, at 112-13 115-16).

In addition to verbal notifications to officers who came to his cell and written grievances, Mr. Murrill "put a piece of paper on the bar itself saying I was supposed to be moved[.]"  (*Id.*, at 112).  He also utilized medical visits in early February to communicate to the corrections officers who escorted him, and possibly to medical staff, "to get me out of there and I feared for my life."  (*Id.*, at 145-50.  *But see id.*, at 149 ("You don't tell the medical staff you fear for your life.  You only talk to the COs and other stuff.")).  He did so "every chance [he] got[.]"  (*Id.*, at 150).  He "was told that's how you, that's how you get out the cell.  You follow the procedures and you talk to the right

---

[6] Mr. Murrill points to no evidence that Defendants knew Mr. Santiago was gang affiliated at the time he transferred into Mr. Murrill's cell.

people and keep it on the down low, and they'll get you out."
(*Id.*, at 146).

During his deposition, the only CO that Mr. Murrill remembered
speaking to was a "major or Captain Moore[.]"  (ECF No. 148-3,
at 116).  He told her "I'm in a cell with someone that if they
found out my charges would kill me when I'm sleeping.  I got to
get out of there."  (*Id.*).  But she made fun of him and said he'd
be going to the Department of Corrections soon anyway.  (*Id.*).
Mr. Murrill made it clear that, although he couldn't remember
others' names, he made the same complaints to "[e]very one that
worked while I was there that came to my cell[.]"  (*Id.*, at 117).
Mr. Murrill now attests in an affidavit that he remembers telling
Defendants Hickson, Ogundipe, and Bolarinwa about his concerns.
(ECF No. 159-54, at 3-4).

Although Mr. Murrill does not remember the names of the
officers to whom he spoke, he has identified the officers who
staffed Section T in February 2015.  Section T had three shifts:
morning (A Shift), afternoon (B Shift), and overnight (C Shift).
A Shift ran from 7:00 a.m. to 3:00 p.m., B Shift ran from 3:00
p.m. to 11:00 p.m., and C Shift ran from 11:00 p.m. to 7:00 a.m.
(*See* ECF No. 159-29, at 8).  Defendants Reaves, Hall, Ogundipe,
and Bailey were assigned to the A Shift for a period of at least
seven days at the time of the attack.  (ECF No. 148-24, at 26-27).
Defendants Ogunmodede, Bolarinwa, and Edwards were assigned to the

B Shift at the same time. (*Id.*, at 79). And Defendants Wright, Hickson, and Hough were assigned to the C Shift. (*Id.*, at 1). Evidence suggests that all corrections officers assigned to a section during a given shift performed rounds. (*See e.g.*, ECF Nos. 148-14, at 35; 148-12, at 162). Even if Duty Captains more often remained in the Duty Captain's office, they would respond to major incidents. (*See* ECF No. 148-27, at 1). Defendant Lemonius was not assigned to Section T at the time, nor oversaw anyone who did. (ECF No. 148-43, at 11 (Section B logbook)).

**D. The Attack and Mr. Murrill's Immediate Care**

Much remains murky about the attack. Mr. Murrill testifies that the COs did not do the required count every morning in the two weeks preceding the attack. (ECF No. 148-3, at 126). Early in the morning of February 16, 2015, Mr. Murrill was praying in his cell. Mr. Murrill's testimony suggests he gets up and starts to pray anywhere between 3:00 a.m. and 7:00 a.m. (*Id.*, at 122 (stating he regularly got up at 3:00 a.m. or 4:00 a.m.), at 157 (stating he may have gotten up at sunrise, around 7:00 a.m. in Baltimore in February)). Whatever time, Mr. Santiago suddenly punched Mr. Murrill in the face and stomped on him until he was unconscious. (ECF Nos. 160-9, at 8 (Sealed)). In Mr. Murrill's words:

> I just know it was early in the morning[.]
> . . . So I was praying and asking God to teach
> me how to turn the other check and not be so

> paranoid and not -- if someone tried to hurt
> me -- try to kill them back.  I started --
> right there as I was doing that prayer, that's
> when I was attacked.

(ECF No. 148-3, at 158-59).  He "remember[s] waking up on [his]

back and [Mr. Santiago] stomping me in the face, and then [he]

went back to sleep."  (*Id.*, at 163).  Although he believes the

attack happened during the overnight shift (but he cannot be sure),

Mr. Murrill was not found until sometime during the morning shift.

(*Id.*, at 159).  All he remembers next is the nurses picking him up

off the ground.  (ECF No. 148-3, at 126).  Mr. Murrill does not

know how long he was unconscious, but he told a nurse at 2:51 p.m.

that he had been attacked six-to-twelve (6-12) hours earlier, or

between 2:51 a.m. and 8:51 a.m.  (ECF No. 160-9, at 8 (Sealed)).

After being found, he waited for hours before being transferred to

the hospital.  (ECF No. 148-3, at 127).  Defendants dispute this

timeline, and relying on records documenting breakfast, security

rounds, and medication rounds, and a logbook which documented a

fight between Mr. Murrill and Mr. Santiago shortly after 12:00

p.m., they contend there was no delay between the attack and Mr.

Murrill receiving care.[7]

---

[7] The parties also discuss at length the injuries Mr. Murrill
suffered and his subsequent care.  Because, as discussed below,
these issues are not really at issue here, these facts are only
discussed as needed.

## II.  Procedural Background

On August 7, 2017, Mr. Murrill, proceeding without a lawyer, filed a complaint against BCDC and BCDC's then Warden, Otis Merritt.  (ECF No. 1).  On September 17, 2017, still without representation, Mr. Murrill filed an amended complaint.  (ECF No. 3).  On March 15, 2018, Warden Merritt and BCDC jointly filed a motion to dismiss the amended complaint.  (ECF No. 18).  On June 26, 2018, Mr. Murrill filed his opposition, (ECF No. 23), and a second amended complaint adding additional defendants, (ECF No. 24).

On January 14, 2019, the court dismissed the claims asserted against BCDC, deferred ruling on the claims against Warden Merritt, appointed counsel for Mr. Murrill, and granted leave to amend the second amended complaint.  (ECF No. 27).  On November 14, 2019, Mr. Murrill, through counsel, filed the operative third amended complaint against twenty-three defendants.  It asserts against all Defendants a Section 1983 claim for (1) violation of the Eighth Amendment, and Maryland state-law claims for (2) gross negligence and (3) negligence.  (ECF No. 45, at 18-25).[8]

---

[8] Mr. Murrill's operative complaint also asserts a Section 1983 Due Process claim and a claim for violation of the Maryland Code of Correctional Services.  Mr. Murrill now states that he declines to prosecute these claims.  (ECF No. 159, at 9 n.1).  Mr. Murrill also states that he "drops his claims against" Defendants Merritt, Price, Woolford, and Harris.  (ECF No. 159, at 26-27, 30).  The court will enter judgment against Mr. Murrill on all

All but two of the defendants answered.  Mr. Murrill moved for entry of default against those who did not, Kelcie Hough and Sunday Ogundipe.  (ECF Nos. 105; 106).  In addition, two defendants filed motions to dismiss: Mr. Hickson on May 26, 2020, (ECF No. 93), and Wexford on July 9, 2020, (ECF No. 98).  In November 2020, the court granted Mr. Murrill's motions for entry of default and Wexford's motion to dismiss.  (ECF No. 108).  Clerk's default was entered against Defendants Hough and Ogundipe, and Wexford was dismissed from the case.  (*Id.*; ECF No. 115).  In addition, the court granted in part and denied in part Mr. Hickson's motion.[9] Mr. Murrill's Fourteenth Amendment Due Process claim (Count II) against Mr. Hickson was dismissed.  (ECF No. 114).

A scheduling order was issued and the parties engaged in discovery.  In November 2021, the State Defendants and Defendant Hickson filed the pending motions for summary judgment.  (ECF Nos. 148; 149).  The State Defendants moved to seal Exhibit Q attached to their motion.  (ECF No. 150).  In January, Mr. Murrill opposed

---

claims against those four defendants and dismiss his Section 1983 Due Process and Maryland Code of Correctional Services claims against State Defendants and Defendant Hickson.  The court will dismiss his Due Process and Maryland Code of Correctional Services claims against defaulted Defendants Ogundipe and Hough.

[9] The court initially denied Mr. Hickson's motion in full, despite holding that Mr. Murrill failed to state a Due Process claim against Mr. Hickson.  (ECF Nos. 108; 107, at 14-17).  Mr. Hickson moved for reconsideration.  (ECF No. 110).  The court granted the motion, amending its earlier order to grant in part and deny in part Mr. Hickson's motion to dismiss.  (ECF No. 114).

both motions and moved to seal many of the exhibits attached to his opposition. (ECF Nos. 159; 161). State Defendants and Defendant Hickson replied in March. (ECF Nos. 162; 163).

## III. Summary Judgment Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment should be granted only when it is perfectly clear that no issue of material fact exists." *Raynor v. Pugh*, 817 F.3d 123, 129 n.2 (4th Cir. 2016) (quotation omitted). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Liberty Lobby*, 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted), but "a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences," *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element that he bore the burden to prove.  *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).

## IV. Statute of Limitations

Defendant Hickson asserts a statute of limitations defense to all of Mr. Murrill's claims against him.  Maryland law establishes a three-year limitations period which applies to Mr. Murrill's Section 1983 and Maryland state-law claims.  Md. Code Ann., Cts. & Jud. Proc. § 5-101; *see Wallace v. Kato*, 549 U.S. 384, 387 (2007) (applying three-year limitations period to Section 1983 claims by analogy to personal injury claims).  Federal law determines when Section 1983 claims accrue by looking to the rules of accrual for "the common-law tort that is most analogous to the plaintiff's § 1983 claim[.]"  *Owens v. Balt. City State's Att'ys Office*, 767 F.3d 379, 388-89 (4th Cir. 2014).  Neither party identifies an analogous common-law tort for Mr. Murrill's Section

17

1983 claims.  The court therefore defaults to the "standard rule," that "a plaintiff's cause of action accrues, and the limitations period commences, when the plaintiff knows or has reason to know of his injury[.]"  *Id.*, at 389.  Although not addressed by either party, Maryland gross negligence and negligence claims accrue "when facts exist to support each element of the action" and the plaintiff "knows or reasonably should have known of the wrong."  *State Auto. Mut. Ins. Co. v. Lennox*, 422 F.Supp.3d 948, 963 (D.Md. 2019) (internal quotation marks and citations omitted).

The limitations period had run for all claims against Mr. Hickson at the time he was named as a defendant in this case.  Mr. Murrill contends that he was assaulted by Mr. Santiago on February 16, 2015.  The limitations period for any claims, state or federal, grounded in a failure-to-protect theory of liability or grounded in a denial-of-medical-care theory specific to the day of the attack began to accrue on that date.  To be timely, any such claims had to be filed against Mr. Hickson no later than February 16, 2018.  The limitations period for any claims grounded in a denial-of-medical-care theory for post-attack care began to accrue, at the latest, on April 14, 2015, because Mr. Murrill does not point to any evidence of denied or delayed care after that date.  (*See* ECF No. 159, at 22-23).  To be timely, any such claims had to be filed no later than April 14, 2018.  Mr. Hickson was not, however,

18

named as a defendant in this case until the operative third amended complaint was filed on November 4, 2019.   (ECF No. 45).

Mr. Murrill can only proceed with his claims against Mr. Hickson if they "relate back" to a timely complaint.   Under Fed.R.Civ.P. 15(c)(1)(C), an amendment that "changes [a] party or the naming of [a] party," including by adding a new party, *Goodman v. Praxair, Inc.*, 494 F.3d 458, 468-69 (4th Cir. 2007) (en banc), can relate back to an original timely complaint and satisfy the limitations period if it meets three requirements.[10]   First, the claim must involve the same transaction or occurrence.   *Goodman*, 494 F.3d at 467.   Second, the new party must have "notice of the action" "within the period provided by Rule 4(m) for service of the summons and complaint" and must have known or should have known that, "but for a mistake in identity," "the action would have been brought against him."   Fed.R.Civ.P. 15(c)(1)(C); *see Goodman*, at 467, 469-71.   Third, the notice must have been such that the party "will not be prejudiced in defending on the merits."   *Id.*   Relation back balances a defendant's statute-of-limitations interest in repose from suit against the general preference for resolving disputes on their merits.   *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 550 (2010); *see also Goodman*, 494 F.3d at 467-68.

---

[10] Mr. Murrill does not suggest that his claims against Mr. Hickson relate back under Fed.R.Civ.P. 15(c)(1)(A), which permits relation back when "the law the provides the applicable statute of limitations allows relations back."

Mr. Hickson challenges notice, arguing that he was not timely made aware of the suit or Mr. Murrill's intent to sue him. Typically, the period for service under Fed.R.Civ.P. 4(m) is ninety (90) days.  However, where a plaintiff seeks to proceed *in forma pauperis* ("IFP"), as Mr. Murrill did here, the Fourth Circuit has held that the Rule 4(m) must be tolled "until the district court screened his *in forma pauperis* complaint and authorized service of process." *Robinson v. Clipse*, 602 F.3d 605, 608 (4th Cir. 2010). As explained more recently in *Williams v. Kincaid*, --- F.4th --- , 2022 WL 3364824, at *11 (4th Cir. Aug. 16, 2022), "we clarified in *Robinson* that 'Rule 15(c)'s notice period incorporates any extension' by a court of that 90-day deadline."  Despite Mr. Murrill's near failure to rebut the statute of limitations argument, Mr. Hickson has not shown that he lacked notice within the Rule 4(m) period.[11]

---

[11] Mr. Murrill contends only that awarding Mr. Hickson judgment on limitations grounds is improper because the court rejected Mr. Hickson's limitations argument at the motion to dismiss stage and that the facts have not changed. (ECF No. 159, at 48).  Mr. Murrill's reliance on that earlier decision is misplaced.  The court held only that Mr. Hickson could not show a clear statute-of-limitations violation on the face of the third amended complaint. (ECF No. 107, at 18-19).  That holding did not foreclose Mr. Hickson from renewing the argument at summary judgment once evidence had been developed.  And, contrary to Mr. Murrill's assertion, new evidence is available.  Mr. Hickson presents evidence of when he first became aware of this lawsuit. At the motion to dismiss stage, he explicitly refrained from offering that evidence to avoid converting his motion from one to dismiss into one for summary judgment. (ECF No. 93-1, at 22 n.4).

As in *Robinson* and *McGraw*, service of process was authorized in this case only "[a]fter extensive proceedings[.]"  *McGraw v. Gore*, 31 F.4th 844, 850 (4th Cir. 2022).  In *Robinson*, the plaintiff filed suit *pro se* in November 2005.  602 F.3d at 606.  On December 1, the magistrate judge prohibited the clerk "from issuing and authorizing service of process" and recommended dismissal.  *Id.*  Robinson moved to add Clipse as a defendant on December 13, but the district court dismissed the action, concluding that suit against Clipse was futile.  *Id.*, at 606-07.  The Fourth Circuit vacated the district court's orders and granted the motion to add Clipse as a party.  *Id.*, at 607.  On remand, Robinson filed amended complaints in May 2007, "the district court authorized the issuance of summons and service of process by the U.S. Marshals Service" in July, and Clipse was served in August.  *Id.*  The Fourth Circuit held that Clipse had actual notice of the suit and Robinson's intent to sue him within the Rule 4(m) period because "the first time that the issuance and service of process was authorized was when the district court entered the" July 2007 order.  *Id.*, at 609.  This result was justified because IFP plaintiffs "should not be penalized for a delay caused by the court's consideration of [their] complaint."  *Id.*, at 608.

In *McGraw*, the plaintiff, a *pro se* prisoner, filed his original complaint in April 2019 and sought to proceed IFP.  31 F.4th at 847.  On April 30, the district court instructed the

plaintiff to file a corrected complaint because he failed to sign the original.  *Id.*  He did so and, in September, the district court screened the complaint for substantive deficiencies and directed the plaintiff "to file a particularized complaint naming individual defendants[.]" *Id.*  He timely filed an amended complaint in October naming Nancy Wargas as a defendant (in addition to another).  *Id.*  In November, the district court completed screening of the amended complaint and found that the claims against Gore "were not clearly frivolous."  *Id.*, at 847-48 (internal quotation marks omitted).  It "allowed the lawsuit to proceed and authorized service of process" by the U.S. Marshals Service.  *Id.*, at 848.  The Fourth Circuit held that this authorization "triggered the service period of Rule 4(m)[.]" *Id.* (citation omitted).  Ms. Wargas was served within 90 days and the Fourth Circuit held that this satisfied Rule 15(c)(1)(C)'s notice requirement.  *Id.*, at 848, 850-51.

In effect, the same delay in allowing the case to proceed and authorizing service occurred here.  Mr. Murrill filed his original complaint on August 7, 2017, and a first amended complaint on September 27, 2017.  (ECF Nos. 1; 3).  The court granted Mr. Murrill's motion to proceed IFP on October 31, 2017, but expressly ordered the clerk to withhold service.  (ECF No. 7).  Consistent with a District of Maryland standing order on service of process in Section 1983 suits, the court ordered the clerk to transmit a

copy of the complaint and amended complaint to the Office of the Attorney General and stated that "[i]f electronic service on behalf of Defendants is not accepted, counsel or a designated representative will notify this Court in writing after receipt of all documents and the Clerk will cause process to be issued promptly." *See In Re: State Prisoner Litigation*, Misc. No. 00-308, Standing Order 2012-01 (D.Md. Apr. 27, 2012), https://www.mdd.uscourts.gov/sites/mdd/files/2012-01.pdf.[12]   At that time, the only named defendants were BCDC and the BCDC Warden, Otis Merritt.  (ECF No. 3, at 1).  Neither refused electronic delivery of the complaint and process was not issued.  They then received several extensions to respond and filed a motion to dismiss in March 2018.  (ECF No. 18).  After receiving an extension of his own to respond, Mr. Murrill opposed, sought to file a second amended complaint, and moved for appointment of counsel.  (ECF Nos. 23; 24; 25).

In January 2019, the court granted the motion to dismiss as to BCDC, holding that it was not a "person" under Section 1983. (ECF No. 26, at 7).  It denied the motion as to Warden Merritt because, "[g]iven Murrill's present self-represented status, serious injuries, transfer from BCDC, and BCDC's closing,

---

[12] Mr. Murrill filed a second amended complaint on June 26, 2018.  (ECF No. 24).  Any claims against Mr. Hickson cannot "relate back" to the second amended complaint because it was filed after the statute of limitations had run.

identifying the officials with personal participation is especially difficult." (*Id.*).  It therefore granted Mr. Murrill's motion to appoint counsel and "defer[red] consideration of [Warden Merritt's] argument until after counsel has an opportunity to develop the facts further and amend the complaint as appropriate." (*Id.*).  Mr. Murrill's current attorney, Maurice Bellan, was appointed as pro bono counsel within a week and made an appearance the next month.  (ECF Nos. 28; 29).  He subsequently served Warden Merritt with document requests and interrogatories to facilitate the filing of an amended complaint.  (*See* ECF No. 31).

Mr. Murrill filed the operative third amended complaint on November 4, 2019.  (ECF No. 45).  On November 5, the court authorized the issuance of summons for various newly added defendants, including Mr. Hickson.  (ECF Nos. 46; 46-8).  The next day, the court again directed the clerk to withhold service and instead electronically transmit the amended complaint to the employers of several other new defendants, including Mr. Hickson. (ECF Nos. 47; 47-2).  Recipients were directed to notify the court if electronic service was not accepted.  (*Id.*).

Although not without some doubt, the court concludes that the Rule 4(m) period did not begin to run until November 4, 2019, when Mr. Murrill filed the operative third amended complaint.  As in *Robinson* and *McGraw*, the court did not authorize the issuance of summons or truly allow the case to proceed until then.  The court

in effect relied on the original motion to dismiss filed by BCDC
and Warden Merritt to screen Mr. Murrill's complaint and at that
time concluded that Mr. Murrill needed representation to proceed
with his suit, in part because the institution where his injuries
allegedly occurred, BCDC, had since closed.   The litigation was
then paused so that Mr. Murrill's appointed pro bono counsel could
investigate and file an amended complaint.   Only then could the
case proceed.   Although the court ordered the original complaint
and first amended complaint be transmitted to BCDC and Warden
Merritt and granted Mr. Murrill's request to proceed IFP in October
2017, the court had not yet allowed the case to go forward and
ordered process to be withheld.

     As a result, Mr. Hickson had notice of this action and that
"[he] was meant to be named a party in the first place" within the
Rule 4(m) period.   *Goodman*, 494 F.3d at 471.   At a minimum, he was
put on notice when his attorneys accepted service on his behalf on
November 20, 2019, sixteen days after the operative complaint was
filed.   (ECF No. 80, ¶2; *see also* ECF No. 63-1).   That alone is
enough.   That said, it remains somewhat unclear when Mr. Hickson
was actually told about the suit.   He stated in a *pro se* letter to
the court that he was notified of the suit by the Office of the
Attorney General on February 20, 2020.   (ECF No. 67).   However, he
now attests in a declaration that he "do[es] not recall precisely
when [he] learned of Lonnie Murrill's lawsuit against [him] and

other officers, but the information available to [him] indicates [he] learned of the lawsuit in February 2020." (ECF No. 149-4, ¶17). He "know[s] that [he] did not learn of the lawsuit prior to being named in the third amended complaint." (*Id.*).

No genuine dispute exists regarding when Mr. Hickson was first made aware of this suit but Mr. Hickson has not shown that he is entitled to judgment on statute of limitations grounds. It appears that Mr. Murrill's claims against him relate back under Fed.R.Civ.P. 15(c)(1)(C).

## V.   Section 1983 Eighth Amendment Claim

Mr. Murrill pursues two theories of liability for his Eighth Amendment claim: failure to protect and denial of medical care. The State Defendants argue that Defendants DPSCS and J. Michael Zeigler, to the extent he is sued in his official capacity, cannot be subject to liability under Section 1983 because they are not "persons" under the statute and have sovereign immunity.[13] They also argue that Mr. Murrill has not shown that most of the defendants had any connection to Mr. Murrill's injuries and purported lack of care thereafter and therefore could not have caused his injuries. They last attack the merits of both theories

---

[13] Defendants contend that Mr. Zeigler is the only defendant sued in his official capacity. Mr. Murrill does not dispute this assertion and the court therefore assumes that all other defendants (aside from DPSCS) are sued in their individual capacities.

of liability, contending primarily that Mr. Murrill cannot prove that they knew he faced a substantial risk of serious harm or that he was in fact denied care.   Mr. Hickson makes largely the same arguments and his claims will be addressed together with those of the State Defendants.[14],[15]

## A.   Section 1983 "Persons" and Eleventh Amendment Sovereign Immunity

State Defendants assert that DPSCS as a state agency and Defendant J. Michael Zeigler, acting in his official capacity as a state employee, are not "person[s]" under Section 1983 and are immune from suit under the Eleventh Amendment.

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional abrogation.   *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984).   Claims against state employees acting in their official capacities are also subject to

---

[14] State Defendants and Mr. Hickson also argue that they are qualifiedly immune from Mr. Murrill's Eighth Amendment claim. However, both pin their arguments on Mr. Murrill's purported failure to show that they violated his Eighth Amendment rights. They do not assert the absence of clearly established law at the time of the alleged violations.   Their qualified immunity arguments therefore cover the same ground as their merits arguments and need not be addressed separately.

[15] State Defendants' arguments that Mr. Murrill's testimony cannot be relied on because of limitations in his memory and his mental health issues are questions of credibility for the jury.

Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

As Judge Chuang recently noted:

> Congress did not abrogate the states' sovereign immunity when it enacted § 1983. *Will*, 491 U.S. at 66; *Dyer v. Md. State Bd. of Educ.*, 187 F.Supp.3d 599, 611 & n.16 (D.Md. 2016).  Furthermore, Maryland has not waived its sovereign immunity for claims brought in federal court.  Md. Code Ann., State Gov't § 12-104(a); *Dyer*, 187 F.Supp.3d at 611.

*Pevie v. Lyons*, No. 17-cv-1796-TDC, 2019 WL 110955, at *3 (D.Md. Jan. 4, 2019).

DPSCS is a department of the state and shares its immunity. *See Wallace v. Dep't of Pub. Safety and Corr. Servs.*, No. 15-cv-2152-RDB, 2016 WL 1597105, at *5 (D.Md. Apr. 20, 2016) (holding that DPSCS is not a "person" under Section 1983 and is immune from a Section 1983 failure-to-protect suit under the Eleventh Amendment).  In addition, Defendant J. Michael Zeigler is immune from suit for actions taken in his official capacity as Acting Secretary of DPSCS.  *See Pevie*, 2019 WL 110955, at *3 (holding warden immune from Section 1983 Eighth Amendment suit).  Mr. Murrill does not even attempt to argue otherwise.  To the extent his citation to *Monell* is an attempt to address this argument, (ECF No. 159, at 40), he is mistaken.  *Monell* liability is only

available for municipalities and is not available for a state or its departments.   Accordingly, State Defendants' motion for summary judgment on Plaintiff's Section 1983 Eighth Amendment claims against DPSCS and J. Michael Zeigler, acting in his official capacity, will be granted.

**B.   Supervisory Liability**

As noted above, State Defendants argue that Mr. Murrill has not shown that most of the defendants had any connection to the alleged violations of Mr. Murrill's Eighth Amendment right.   "It is axiomatic that liability under 42 U.S.C. § 1983 must be premised on personal conduct[.]"   *Nichols v. Maryland Correctional Institution—Jessup*, 186 F.Supp.2d 575, 583 (D.Md. 2002) (citing *Monell v. Dept. of Social Services*, 436 U.S. 658, 691-695 (1978)). Although this does not allow for vicarious liability, a supervisor may still be liable under Section 1983 if his alleged supervisory indifference or tacit authorization of subordinate misconduct is a causative factor in a person's constitutional injuries.   *See Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

The merits of State Defendants' arguments for those corrections officers that would have had contact with Mr. Murrill is best resolved within Defendants' merits challenges.   However, State Defendants' arguments specific to those defendants with supervisory responsibilities can be addressed here.

Mr. Murrill has not shown that any defendants have supervisory liability under Section 1983.   As State Defendants helpfully summarize:

> [A] claim of supervisory liability under § 1983 requires a showing that: (1) the supervisor had "knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury" to the plaintiff; (2) the supervisor's response "was so inadequate as to show 'deliberate indifference to or tacit authorization of'" the alleged conduct; and (3) there is "'an affirmative causal link' between the supervisor's inaction" and the plaintiff's injury. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

(ECF No. 162, at 15-16).  As discussed further below, Mr. Murrill's primary theories of liability are that the corrections officers staffing Section T ignored and mocked his requests to be transferred out of his cell with Mr. Santiago because he feared for his life and that they either ignored Mr. Murrill's injuries or failed to conduct rounds on the day of the attack, causing a six-to-twelve (6-12) hour delay in care.

First and foremost, Mr. Murrill cannot show Mr. Zeigler's personal involvement.  Without citation to the record, Mr. Murrill states only that Mr. Zeigler is Acting Secretary of DPSCS and "responsible for administration of the Department." (ECF No. 159, at 27).  Mr. Murrill does not even attempt to show that Mr. Zeigler worked at DPSCS during the relevant period, and State Defendants, pointing to their responses to Plaintiff's First Interrogatories,

contend that he did not and that he is not the Acting Secretary now.  (ECF No. 148-1, at 21-22 (citing ECF No. 148-34, at 5)).[16] Summary judgment will be entered in favor of Mr. Zeigler.

In addition, Mr. Murrill has not shown that the supervisor defendants—Warden Johnson, Assistant Warden Peay, and Security Chief Young, were aware that the corrections officers in Section T ignored Mr. Murrill's complaints or his injuries.  Indeed, his whole theory is that the corrections officers in Section T refused to raise these issues with their superiors as they should have. And Mr. Murrill does not attempt to show that the alleged Eighth Amendment violations by the Section T officers were merely one example of pervasive practices at BCDC.  Absent such evidence, Mr. Murrill cannot show that the actions of the Section T officers were caused in part by the indifference or tacit authorization of Defendants Johnson, Peay, and Young.  State Defendants' motion for summary judgment will be granted as to Mr. Murrill's Eighth Amendment claims against these defendants, to the extent they are grounded in supervisory liability.[17]

_____

[16] For this reason, Mr. Zeigler cannot be liable in his personal or official capacity for any claims.

[17] Mr. Murrill also attempts to argue that two policies adopted by BCDC violated his Eighth Amendment rights.  To the extent he argues that Defendants Johnson, Peay, or Young were responsible for adopting those policies, they would be liable for their personal conduct, rather than their conduct as supervisors.  Those theories of liability are discussed below.

C.    **Failure to Protect**

As the court held in its preceding memorandum opinion, "[t]he [E]ighth [A]mendment protects a convicted inmate from physical harm at the hands of fellow inmates resulting from the deliberate or callous indifference of prison officials to specific known risks of such harm[.]" *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (citation omitted). An inmate must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) that the official was deliberately indifferent to that substantial risk to his health and safety. Deliberate indifference is a subjective standard, meaning that the prison official must have actually known or been aware of the excessive risk to inmate safety and acted unreasonably in light of that risk. *See Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015); *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). Defendants argue that Mr. Murrill cannot prove his Eighth Amendment claims against them because he cannot establish that they acted with deliberate indifference or, as noted above, that their personal conduct caused Mr. Murrill harm.[18]

_____

[18] State Defendants attempt to cast doubt on whether Mr. Murrill suffered a serious injury by, for example, suggesting that Mr. Murrill's neck was already broken. (ECF No. 148-1, at 9-10, 17). But they do not specifically argue that they are entitled to summary judgment on this element. To the extent they meant to do so, they are mistaken. As this court held in *Duncan v. Horning*, a plaintiff can show objectively serious harm by the mere fact

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  For example, if a

> plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.* (cleaned up).[19]

There are two primary ways that Defendants might have become aware of a risk of serious harm to Mr. Murrill.  The first was simply that the risk posed by Mr. Santiago was obvious.  Plaintiff points to a variety of reasons why the risk posed by Mr. Santiago was obvious: the fact that he had just assaulted other inmates,

---

that he "required treatment from both the prison medical ward and an outside hospital[.]"  No. 13-cv-0448-DKC, 2017 WL 3968474, at *5 (D.Md. Sept. 8, 2017).

[19] Contrary to State Defendants' assertions, it is enough at this stage for a plaintiff to introduce evidence sufficient to infer that a defendant had the requisite knowledge.  The case it cites to the contrary is inapplicable because it concerned an appeal from a bench trial.  *Rich v. Bruce*, 129 F.3d 336, 336 (4th Cir. 1997).

that he was younger than Mr. Murrill, and that he was a pre-trial detainee while Mr. Murrill was a sentenced inmate (after February 5). The court need not resolve whether the risk was sufficiently obvious because Mr. Murrill does not point to any evidence that one of the defendants made the decision to house Mr. Murrill with Mr. Santiago.

The second way that Defendants might have had subjective knowledge of the risk was by Mr. Murrill telling them. Failure to act once alerted, either by reporting Mr. Murrill's warnings or separating him from Mr. Santiago, would be sufficient to show deliberate indifference. Evidence that Mr. Murrill told a defendant he was in mortal danger from Mr. Santiago would give them subjective knowledge of a risk to Mr. Murrill and failing to act would be the defendants' own conduct and unreasonable in light of the circumstances. The primary trouble for Mr. Murrill is that he has struggled to identify the individuals to whom he communicated the risk.

Mr. Murrill has created a genuine dispute of material fact regarding whether Defendants Bailey, Bolarinwa, Hickson, Ogunmodede, Reaves, and Wright were told about the risk and personally engaged in unreasonable conduct in spite of that risk. Mr. Murrill now attests in an affidavit that he told Defendants Bolarinwa and Hickson about the danger posed by Mr. Santiago. Contrary to State Defendants' assertion, this is no sham affidavit.

34

That rule "must be carefully limited to situations involving flat contradictions of material fact." *Mandengue v. ADT Sec. Sys., Inc.*, No. 09-cv-3103-ELH, 2012 WL 892621, at *18 (D.Md. Mar. 14, 2012).  That Mr. Murrill now remembers speaking to those two defendants does not flatly contradict his earlier inability to do so.

In any case, Mr. Murrill has done just enough to create a dispute about the above Defendants' knowledge through testimony that he reported feeling threatened by Mr. Santiago to all employees who worked in Section T in the weeks prior to the attack. He testifies that, starting with the corrections officer that delivered Mr. Santiago, he told every corrections officer he encountered about the danger that Mr. Santiago posed to him.  He asked them for ARP and grievance forms and tried to have those delivered.  He asked for the shift supervisors to come to his cell so he could tell them too.  He even tried to tell the officers who escorted him to his medical appointments.  Taken together with the post assignment worksheet that identifies Defendants Bailey, Bolarinwa, Hickson, Ogunmodede, Reaves, and Wright as being assigned to Section T during the relevant period or overseeing those who were, and evidence indicating that they at least sometimes made rounds in Section T, a jury could find that Mr. Murrill told all of them he needed to be separated from Mr.

Santiago.[20]   None of them dispute that they spent time in Section
T during this time or contend that they never made rounds there.
Even Mr. Hickson concedes that he was in T Section at least twice
during early February.  (ECF No. 163, at 6).   The only officers
Mr. Murrill can tie to Section T (through the post assignment
worksheet), or direct oversight thereof, not included in this list
are Defendants Edwards and Hall because there is no evidence that
they ever conducted rounds.

These are not mere "generalized allegations," as suggested by
State Defendants.   The cases they cite for this proposition are
distinguishable.   In *Ervin v. Corizon Health*, the court dismissed
the   claims   against   one   defendant   because   the   complaint
"contain[ed] no specific allegations against him."   No. 19-cv-
1666-ELH, 2020 WL 2490042, at *22 (D.Md. May 13, 2020).   Whatever
the strength of Mr. Murrill's evidence, the Section T Defendants
cannot say he makes no allegations against them.   And in *Aurel v.
Hallworth*, the only evidence that defendants improperly denied the
plaintiff   medical   care   were   "generalized   allegations   that
defendants destroyed or ignored his sick call slips[.]"   No. 19-

---

[20] There is no evidence in the record that Defendant Wright
ever made rounds but the other Duty Captains, Reaves and
Ogunmodede, testified that they sometimes did, unlike some of the
Duty Lieutenants.   Defendant Lemonius was not assigned to Section
T nor did he oversee anyone there.   Defendants Clark and Bamby
conducted rounds but were assigned to the medical transport unit
so their presence in Section T during the relevant window cannot
be inferred from their position, as it can for the Duty Captains.

cv-0185-ELH, 2020 WL 5423184, at *19 (D.Md. Sept. 10, 2020). Those allegations were "belied by extensive documentation of the medical care received" by the plaintiff. Unlike that case, there is no record indicating that Defendants in fact reported Mr. Murrill's warnings. In fact, they make a point of noting that no grievances were recorded from Mr. Murrill until after his attack.

Nor were Mr. Murrill's warnings insufficiently detailed to put these defendants on notice to the risk. In *Klebanowksi*, the Seventh Circuit held that an inmate's statements are insufficient to give notice of a serious risk where they "did not provide the identities of those who threatened the inmate, nor state what the threats were." *Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008). A jury could find that Mr. Murrill satisfies this standard. Although he gave corrections officers various reasons for why he should have been moved from his cell, the core of his testimony is that he told every corrections officer he encountered that Mr. Santiago was a dangerous gang member who might kill him and tried to file grievances stating the same. A jury could infer that Mr. Murrill delivered that message to every officer staffed in Section T in early February 2015.

Plaintiff also testifies that he sent a grievance letter to the Warden. This statement, alone, is insufficient to create a material dispute of fact as to Warden Johnson's subjective knowledge of the risk against him. Of course, if he had delivered

a grievance letter to her, she could have been liable based on her own conduct, and not based on her supervisory conduct. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). However, Mr. Murrill's theory is that the corrections officers he attempted to give grievances to and warn about the danger posed by Mr. Santiago did not take him seriously and never recorded his grievances. It would be illogical, without more, for a jury to conclude that the officers passed on only one grievance and it was to the warden.[21]

Plaintiff's failure-to-protect claims against Defendants Bailey, Bolarinwa, Hickson, Ogunmodede, Reaves, and Wright, grounded in the theory that they were deliberately indifferent to his warnings of the risk posed by Mr. Santiago, may proceed. Defendants' motions for summary judgment will be denied as to those claims. The motions will be granted as to all other remaining failure-to-protect claims.

---

[21] Plaintiff also proposes, somewhat tangentially, two other bases for the failure-to-protect claim. First, he suggests that the Department was deliberately indifferent to a risk of serious harm when it implemented a practice and policy of not providing single-cell protective custody. Second, he asserts that the Department was deliberately indifferent because it failed to train its officers on how to report serious incidents. (ECF No. 159, at 41-42). However, both theories of liability appear to be directed at DPSCS alone, because they are raised within Plaintiff's mistaken *Monell* argument. Moreover, these arguments (as others) are bereft of record citations. The court need not reach these theories because DPSCS is immune from the Section 1983 claims.

### D.   Denial of Medical Care

"The [E]ighth [A]mendment protects a convicted inmate from . . . harm resulting from deliberate indifference of prison officials to serious medical needs[.]" *Pressly*, 816 F.2d at 979 (internal citation omitted). An inmate must show "that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need." *Barnes v. Wilson*, 110 F.Supp.3d 624, 631 (D.Md. 2015) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available." *Id.* Ordinarily, "it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm. But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a 'significant injury.'" *Ervin*, 2020 WL 2490042, at *20 (cleaned up).

For his denial-of-medical-care claim, Mr. Murrill can point to the possibly hours-long delay in providing him with treatment immediately following the attack by Mr. Santiago. Defendants argue that they are entitled to judgment because Mr. Murrill has not shown that they acted unreasonably and because they were not

personally involved.  They first argue that the overwhelming weight of the evidence demonstrates that no such delay occurred and that, in fact, they acted with diligence to come to Mr. Murrill's aid. (ECF No. 148-1, at 30 ("*See Love v. Beasley*, 788 F.App'x 935, 936 (4th Cir. 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (holding that when a party's version of the facts 'is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.')")).

Defendants are nearly right, and Plaintiff nearly fails to introduce enough evidence for a reasonable jury to be able to credit his version of the timing of the attack against the substantial records which suggest Mr. Murrill was not attacked until approximately noon.  But he clears the hurdle, if barely. Most important in this analysis is his citation to the hospital record in which a nurse's notes state, presumably based on what Mr. Murrill told her, that he had been attacked six-to-twelve (6-12) hours earlier.[22]  As discussed above, if true, that would mean Mr. Murrill went without care for at least three-to-four hours. While Mr. Murrill's deposition testimony on this subject is considerably less certain, a jury could find that on the day of

---

[22] This statement would be admissible under Federal Rule of Evidence 803(4).  *See, e.g.*, *Doali-Miller v. SuperValu, Inc.*, 855 F.Supp.2d 510, 513-15 (D.Md. 2012).

the attack Mr. Murrill had an accurate memory of when the attack occurred.  And, while Mr. Murrill admits in his deposition that he cannot now be sure when he was attacked, those recollections can support finding that the attack happened during the early morning hours.

Of course, Plaintiff still must show personal involvement. The range of times at which a reasonable jury could conclude that Mr. Murrill was attacked spans across the C and A Shifts that traded at 7:00 a.m. on February 16.  It is not possible to narrow the range of employees further because there remains a genuine dispute of fact about when Mr. Murrill was attacked.  If it was before 7:00 a.m., then every member across both shifts could have been deliberately indifferent to his injuries.  If it was after 7:00 a.m., then only the members of A Shift could have been indifferent.

Therefore, Mr. Murrill has created a genuine dispute of material fact about whether Defendants Bailey, Reaves, and Wright deliberately ignored his need for medical care for hours.  They were assigned to work either the C Shift or A Shift the morning of February 16 and do not dispute that they were there.[23]  Because

---

[23]  Mr. Murrill separately argues that T Section was understaffed during the C Shift and this caused a serious risk of harm because the CO on duty would not be able to conduct rounds. However, Mr. Murrill cannot substantiate the suggestion that having only one CO on duty during the overnight shift created a

the officers had a duty to do rounds, they should have discovered Mr. Murrill promptly and sought care for him. There is no reasonable explanation for an hours-long delay.

Defendant Hickson was also assigned to work Shift C, but he testifies that he was located in a separate building that morning. The post assignment document is not precise about where individual employees were stationed. In the face of such testimony, the post assignment sheet cannot create a genuine dispute about where Defendant Hickson was. As a result, it is undisputed that he was not in Section T and, therefore, Mr. Murrill cannot show he was aware of Mr. Murrill's injuries or ignored them.

In addition, there is insufficient evidence to suggest that Defendants Clark and Bamby were deliberately indifferent. They concede that there was a two-hour delay between when Mr. Murrill first arrived at the BCDC medical facility after noon and when they departed to take him to the hospital. They were not made aware of Mr. Murrill's need for treatment until after noon. They could not be responsible for any delay prior to that. The mere fact of the delay in transport is not enough alone to support an inference of unreasonable conduct. Mr. Clark testifies that such

---

serious risk because he cites to statements indicating T Section required two COs during the morning and afternoon shifts, and does not acknowledge testimony that that rule did not apply to the overnight shift, as pointed out by Defendant Hickson. (ECF No. 163, at 6-7).

delays were sometimes caused by the lack of transport vehicles available for use.  Mr. Murrill does not dispute this statement. Even if the lack of a vehicle might have been unreasonable, Mr. Murrill does not point to any evidence that that was in Mr. Clark or Mr. Bamby's control.[24]

Plaintiff's denial-of-medical care claims against Defendants Bailey, Reaves, and Wright, grounded in the theory that they knew Mr. Murrill was injured but did not get him medical assistance for hours after his attack, may proceed.  Defendants' motions for summary judgment will be denied as to those claims.  The motions will be granted as to all other remaining denial-of-medical-care claims.

## VI.  Maryland Claims

The State Defendants argue that DPSCS and all individual defendants sued in their official capacities have sovereign immunity from Plaintiff's state-law claims.  They also assert that the individual defendants are immune from the negligence claims.

---

[24] Outside the argument section of his brief, Mr. Murrill hints at alternative arguments about being transported to the hospital without any precautions for his broken neck and a weeks-long delay in facilitating his follow-up neurosurgeon appointment. He does not point to these events in his argument section nor identify any injuries that resulted from them.  He does additionally argue that he was subsequently transferred to new facilities without his medications but does not identify who was responsible for these decisions and his only indication of the injury caused was that it "made a bad situation worse."  None of these gestures is enough to create a genuine dispute that an Eighth Amendment violation occurred.

Lastly, they attack both state-law claims on the merits.   The various sovereign immunity arguments are addressed together before proceeding to the merits.

### A.   Sovereign Immunity

The State Defendants argue that "the Department is entitled to immunity under the Eleventh Amendment from all of Plaintiff's claims," citing to *Pennhurst State School & Hosp.*, 465 U.S. at 98. (ECF No. 148-1, at 38).   They assert this same defense for all individual defendants sued in their official capacities.   (*Id.*). As discussed above, that includes only Defendant J. Michael Zeigler.   In addition, the State Defendants argue that defendants sued in their individual capacities are immune from the negligence claims.   Mr. Murrill does not respond, as he did not for the State Defendants' Section 1983 sovereign immunity arguments.

As already stated above, a state, its agencies, its and departments are immune from citizen suits in federal court unless Congress has abrogated immunity or the state has consented to suit. *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 99-100.   Maryland has waived sovereign immunity from certain tort suits brought by its own citizens under the MTCA.   Under the MTCA, *see* Md. Code Ann., State Gov't § 12-101 *et seq.*, "the immunity of the State and of its units is waived as to a tort action," subject to the MTCA's exclusions and limitations, *id.* § 12-104(a), but only for suits in

state court.  Accordingly, all state law claims against the DPSCS and any defendant sued in his official capacity will be dismissed.

By contrast, defendants sued in their individual capacities are immune from Mr. Murrill's negligence claims, but not his gross negligence claims.  "State personnel . . . are immune . . . from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence[.]"  Md. Code Ann., Cts. & Jud. Proc. § 5-522(b); *see also* Md. Code Ann., State Gov't §12-105; *Lee v. Cline*, 384 Md. 245, 261 (2004) (holding that this immunity extends to constitutional torts).  As discussed above, there appears to be no dispute that all defendants sued in their individual capacities are state personnel.  No party discusses whether the conduct at issue here was within the scope of those defendants' public duties.  Again, however, that issue doesn't appear to be in dispute.  Mr. Murrill's allegations pertain exclusively to the individual defendants' failure to carry out their job responsibilities.  Plaintiff does not suggest that this suit is about private conduct.  Moreover, Mr. Murrill appears to concede state personnel immunity when he notes that state personnel "'lose the protection of immunity'" if they "are found to have acted with malice or engaged in conduct outside the scope of their employment[.]" (ECF No. 159, at 47-48 (quoting *Robinson v.*

*Pytlewsi*, No. 19-cv-1025-PX, 2020 WL 607030, at *9 (D.Md. Feb. 7, 2020))).[25]

### B.   Gross Negligence

Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbre v. Pope*, 402 Md. 157, 187 (2007) (citation omitted).   Defendants argue that Mr. Murrill cannot establish that they acted with reckless disregard for the consequences of their actions.   But, as State Defendants concede, and Plaintiff does not challenge, "analysis of [the gross negligence] claim yields the same result as for Plaintiff's deliberate indifference claim[.]"   (ECF No. 148-1, at 40).   As the court in *Ervin* stated, "deliberate indifference is a higher standard for culpability than mere negligence or even civil recklessness."   2020 WL 2490042, at *20 (cleaned up).   Plaintiff's gross negligence claims against Defendants Bailey, Bolarinwa, Hickson, Ogunmodede, Reaves, and Wright for failure to act on Mr. Murrill's warnings and against Defendants Bailey, Reaves, and Wright for delaying Mr. Murrill's medical care on the day of the

---

[25] The court need not reach State Defendants' "public official" immunity arguments which address only the negligence claims against individual-capacity defendants.   (ECF No. 148-1, at 39).

attack may proceed.  Defendants' motions for summary judgment will be denied as to those gross negligence claims, and granted as to all others remaining.

## VII. Motions to Seal

A motion to seal must comply with Local Rule 105.11, which requires that the proponent include "(a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections."  This rule endeavors to protect the common law right to inspect and copy judicial records and documents, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), while recognizing that competing interests sometimes outweigh the public's right of access, *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

### A. State Defendants' Request to Seal Exhibit Q

State Defendants' motion will be granted in part and denied in part.  State Defendants described Exhibit Q as a "Resident Grievance Log."  (ECF No. 148-1, at 13).  Its sections are titled, "Grievance Index January 2015," "Grievance Index February 2015," "Grievance Index March 2015," and "Grievance Index April 2015." (ECF No. 148-19, at 1, 19, 35, 58 (Sealed)).  The index includes entries summarizing grievances filed between January and April 2015, including many filed by non-parties.  Those entries sometimes

contain sensitive personal and medical information and should remain confidential. These records should remain confidential.

However, the court notes that State Defendants cite to Exhibit Q to show that the only grievances recorded for Mr. Murrill "were dated and submitted after the incident, not before." (ECF No. 148-1, at 13). However, the page cited is not included in Exhibit Q and the court cannot find any entries attributed to Mr. Murrill.[26] State Defendants may wish to file a corrected excerpt of the index that includes the grievances attributed to Mr. Murrill. Should they do so, they are encouraged to limit the excerpt to pages listing Mr. Murrill's grievances. Any such corrected excerpt should be filed publicly, with non-parties' sensitive personal and medical information redacted.

### 1.   Mr. Murrill's Request to Seal Various Exhibits

Mr. Murrill's motion will be granted in part and denied in part. He seeks to seal his own exhibits and retroactively to seal exhibits relied on by State Defendants.

Mr. Murrill seeks to seal the following documents attached to his opposition to Defendants motions for summary judgment: Exhibits A, E, F, G, H, S, T, V, Y, Z, NN, OO, PP, QQ, RR, SS, TT, UU, VV, WW, and XX. He asserts that Exhibits F, G, S, T, and V contain personal information about detainees who are non-parties

---

[26] State Defendants' citations to Bates Stamp numbers are inaccurate throughout their papers, unfortunately.

to this action.  He asserts that Exhibits H, Z, NN, OO, PP, QQ, RR, SS, TT, UU, and VV are his medical records, which he has a strong interest in keeping private.  Although left off this list, Exhibit XX is also one of Mr. Murrill's medical records.  He asserts that Exhibits A, E, and WW are expert reports which rely heavily on his medical records.  He asserts that Exhibit Y contains his social security number.  Mr. Murrill also requests that the following documents attached to State Defendants' motion for summary judgment be sealed: Exhibits D, E, F, G, H, X, and DD.  He asserts that all these exhibits, except Exhibit D, contain his medical records.  He asserts that Exhibit D contains his social security number.

Mr. Murrill's requests to seal his own medical records and records that include personal information about non-party detainees will be granted.  They contain sensitive information that can remain confidential at this time.  Mr. Murrill's Exhibits F, G, H, S, T, V, Z, NN, OO, PP, QQ, RR, SS, TT, UU, VV, and XX will remain sealed.  The clerk will be directed to seal State Defendants' Exhibits E, F, G, H, X, and DD.

The court notes, however, that some of the information included in these materials is referenced publicly either directly in the parties' motions or indirectly through other exhibits like depositions.  Those references and any references to the same in this opinion will not be sealed or redacted.  In addition, the

decision to seal the underlying records at this stage may not hold at trial.  Much of the information in the medical records centers on Mr. Murrill's care around the time of he was assaulted.  And the non-party detainee with the most personal information in the exhibits is his assailant, Mr. Santiago.  The public's need to have access to at least some of that information will be appreciably greater should this case proceed to trial.

Mr. Murrill's request to seal medical expert reports that rely on his underlying medical records will be denied.  Unlike the underlying records, the reports contain little if any extraneous information about Mr. Murrill's health and care.  In addition, Mr. Murrill quotes heavily from the reports in his opposition.  (*See* ECF No. 159, at 21, 24-26, 43-44).  The Clerk will be directed to unseal Mr. Murrill's Exhibits A, E, and WW.  He will not be permitted to withdraw those exhibits.

Mr. Murrill's request to seal records which contain his social security number will be granted in part and denied in part.  Those records can be filed in a redacted form.  Mr. Murrill will be directed to file publicly a version of his Exhibit Y in which his social security number is redacted.  The clerk will be directed to seal State Defendants' Exhibit D and State Defendants will also be directed to file publicly a redacted version.  The court takes notice State Defendants' Exhibit A also includes Mr. Murrill's social security number.  The clerk will be directed to seal State

Defendants' Exhibit A and State Defendants will be directed to file publicly a redacted version.

**VIII.    Conclusion**

For the foregoing reasons, State Defendants' motion for summary judgment will be granted in part and denied in part. Defendant Hickson's motion for summary judgment will be granted in part and denied in part.  State Defendants' motion to seal will be granted.  Mr. Murrill's motion to seal will be granted in part and denied in part.


                                          /s/
                                    _____
                                    DEBORAH K. CHASANOW
                                    United States District Judge
